**BRODSKY SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Boulevard, Suite 300
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRETT BAILEY,<br><br>　　　　　　Plaintiff,<br><br>vs.<br><br>CEPTON, INC., JUN PEI, JUN YE, XIAOGANG ZHANG, TAKAYUKI KATSUDA, HIDEHARU KONAGAYA, GEORGE SYLLANTAVOS, and MEI WANG,<br><br>　　　　　　Defendants. | Case No.:  5:24-cv-7581<br><br>**Complaint For:**<br><br>(1) Violation of § 14(a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Brett Bailey ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1. Plaintiff brings this stockholder action against Cepton, Inc. ("Cepton" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants," collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts

1. to sell the Company to Koito Manufacturing Co., Ltd. ("Koito") as a result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in an July 29, 2024, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Cepton stockholders will receive $3.17 per share in cash.

3. Thereafter, on September 25, 2024, the Company filed a Preliminary Proxy Statement on Form PREM14A (the "Proxy Statement") with the SEC in support of the Proposed Transaction.

4. The Proposed Transaction is unfair for a number of reasons. Significantly, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For example: (a) Company insiders own large illiquid blocks of Company stock which will be converted into merger consideration; (b) Company insiders own vested and unvested RSU awards, and other equity awards, all of which are subject to accelerated vesting and conversion into merger consideration; and (c) certain Company executives are entitled to severance packages, often referred to as "golden parachute" packages, entitling same to millions of dollars not shared by Plaintiff and other Company common stockholders.

5. The Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed, and rational decision of whether to vote in favor of the Proposed Transaction and is thus in violation of the Exchange Act. As detailed below, the Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Cepton, provided by Cepton management to the Company Board, Special Committee of the Board of Directors (the "Special Committee"), and the Board's financial advisor, Craig-Hallum Capital Group, LLC ("Craig-Hallum"); and (c) the data and inputs underlying the

1  financial valuation analyses, if any, that purport to support the fairness opinion created by Craig-Hallum if any, and provided to the Company and the Special Committee.

6. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff.

**PARTIES**

7. Plaintiff is a citizen of Indiana, and at all times relevant hereto, has been a Cepton stockholder.

8. Defendant Cepton provides lidar-based solutions for automotive, smart cities, smart spaces, and smart industrial applications in the United States, Japan, China, and internationally. The Company is incorporated in Delaware and has its principal place of business at 399 West Trimble Road, San Jose, CA 95131. Shares of Cepton common stock are traded on the NASDAQ Capital Markets ("NASDAQ") under the symbol "CPTN."

9. Defendant Jun Pei ("Pei") has been Chairperson of the Company at all relevant times. In addition, Defendant Pei serves as the Company's Co-Founder and Chief Executive Officer ("CEO").

10. Defendant Jun Ye ("Ye") has been a director of the Company at all relevant times.

11. Defendant Xiaogang Zhang ("Zhang") has been a director of the Company at all relevant times.

12. Defendant Takayuki Katsuda ("Katsuda") has been a director of the Company at all relevant times.

13. Defendant Hideharu Konagaya ("Konagaya") has been a director of the Company at all relevant times.

14. Defendant George Syllantavos ("Syllantavos") has been a director of the Company at all relevant times.

15. Defendant Mei Wang ("Wang") has been a director of the Company at all relevant times.

16. Defendants identified in ¶¶ 9 - 15 are collectively referred to as the "Individual Defendants."

17. Non-Party Koito manufactures and markets automotive lighting equipment, aircraft parts, electrical equipment, and other products in Japan.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

19. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

20. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District; for example, the Company maintains its headquarters in this District.

## SUBSTANTIVE ALLEGATIONS

*The Flawed Sales Process*

21. As detailed in the Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company.

22. The Proxy Statement fails to disclose why the Company would agree to a deal that did not include a minority-of-the-majority provision considering Koito owned 30.1% of the Company pre-merger, and Defendant Pei and Defendant Ye entered into voting support

agreements concurrently with the signing of the merger documents effectively giving Koito 62% of the voting power.

23. Of significant note, the Company's executive officers, including Defendant Pei (together the "Rollover Stockholders"), will be treated differently than all other stockholders of Cepton, including Plaintiff. Specifically, the Rollover Stockholders will be allowed to roll over their equity into the new entity ("Holdco"), allowing the Rollover Stockholders to continue to reap the benefits of their investments while all other stockholders of the Company, such as Plaintiff, are frozen out of their ownership interests. Notably, the Preliminary Proxy Statement fails to provide information justifying this decision.

24. The Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Koito, whether this agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Proxy Statement, if so, in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away

25. Further, the Proxy Statement fails to adequately disclose any and all of the communications regarding post-transaction employment during the negotiation of the underlying transaction which must be disclosed to stockholders.

26. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

*The Proposed Transaction*

27. On July 29, 2024, Cepton and Koito issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> SAN JOSE, Calif.--(BUSINESS WIRE)--Jul. 29, 2024-- Cepton, Inc. ("Cepton" or the "Company") (Nasdaq: CPTN), a Silicon Valley innovator and leader in high performance lidar solutions, announced today that it has signed a definitive agreement (the "Agreement") providing for the acquisition by KOITO MANUFACTURING CO., LTD. ("Koito") (TSE: 7276), a leading automotive tier

one supplier, of all of the outstanding capital stock of the Company not owned by Koito for $3.17 per share in an all-cash transaction.

This press release features multimedia. View the full release here: https://www.businesswire.com/news/home/20240729802746/en/

Cepton stockholders will receive $3.17 per share in cash, which represents a premium of approximately 25.3% to the closing price as of Friday, July 26, 2024. The material terms of the transaction will be described in Cepton's current report on Form 8-K, which will be filed with the Securities and Exchange Commission today.

The proposed transaction will complement Koito's existing sensor technology roadmap, while providing Cepton with the financial stability and scalability that are crucial to the commercialization of its lidar technology. After the transaction, Cepton will operate as a privately held indirect subsidiary of Koito in the U.S.

"I am excited about the next stage of Cepton's growth as we embark on a new journey together with Koito," said Dr. Jun Pei, CEO and Co-founder of Cepton. "Over the past few years, we have achieved many remarkable milestones in product innovation and development, establishing ourselves as one of the most trusted lidar solutions providers in the automotive industry. A significant portion of our efforts were greatly supported by Koito as our long-term partner and investor.
"As we carry on our pioneering spirit as a Silicon Valley company and deepen our commitment to driving cutting-edge innovation, leaning on Koito's century-old heritage of engineering rigor will heighten our dedication to delivering quality solutions to customers worldwide. Our partnership with Koito will provide us with unique access to a broader range of opportunities and resources and help us stay resilient to industry challenges in a way no other lidar company can. This will position us as a leading automotive lidar company for years to come, as Cepton continues to execute current automotive programs and actively manage future OEM initiatives."

Michiaki Kato, President and COO of Koito, said: "We appreciate and are impressed by the outstanding technical capabilities exhibited by the Cepton team throughout our years of collaboration. We recognize this proposed transaction is an essential step toward realization of Koito's vision of 'lighting the way for our sustainable future.' We are convinced that having Cepton as a member of the Koito group will significantly enhance the competitiveness of our sensor business.

Under our corporate message of 'Lighting for Your Safety,' Koito has been contributing to realizing a safe and secure mobility society through 'light' in the field of automotive lighting equipment and other products. By adding lidar, a sensor that uses 'light,' to our product lineup, we will contribute to safety and security in the next-generation mobility society where ADAS and autonomous driving become

popular, and we will aim for sustainable corporate growth by providing even higher value-added products through synergy between automotive lighting equipment and sensor technology."

Mitch Hourtienne, Chief Commercial Officer at Cepton, adds: "In addition to broadening business platforms for both Koito and Cepton, we expect our partnership to make a positive impact on the overall automotive lidar ecosystem, driving industry standards and accelerating adoption at scale. We are ready to better support our automotive OEM customers in safely deploying lidar-enhanced assisted and autonomous driving platforms through a streamlined and stabilized supply chain, making safe autonomy truly available in every consumer vehicle."

O'Melveny and Myers LLP is acting as legal advisor to the Company. Craig-Hallum Capital Group LLC is acting as exclusive financial advisor to a special committee of disinterested and independent members of the Company's board of directors and Cooley LLP is acting as legal advisor to the special committee. Davis Polk & Wardwell LLP and Nishimura & Asahi (Gaikokuho Kyodo Jigyo) are acting as legal advisors to Koito. WTW is acting as HR advisor to Koito.

**Closing Conditions and Timing**

The Transaction, which has been approved by each company's Board of Directors and recommended to Cepton's stockholders by Cepton's Board of Directors, is expected to close in the first quarter of 2025, subject to approval of Cepton's stockholders representing at least a majority of the outstanding shares, regulatory approvals, and other customary closing conditions.

*Potential Conflicts of Interest*

28.     The breakdown of the benefits of the deal indicates that Cepton insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of Cepton.

29.     Company insiders, currently own large, illiquid portions of Company stock, Company RSUs, and Company Options all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction, not shared amongst Plaintiff and other public stockholders of the Company as follows:

| Name | Shares of Common Stock Held Directly[1] | | Company RSUs[2] | | Company Options[3] | | Total ($) |
|---|---|---|---|---|---|---|---|
| | Number of Shares (#) | Value of Shares ($) | Number of Shares (#) | Value of Shares ($) | Number of Shares (#) | Value of Shares ($) | |
| Dr. Jun Pei | 2,585,019 | 8,194,510 | 31,438 | 99,659 | — | — | 8,294,169 |
| Dr. Dongyi Liao | 30,744 | 97,458 | 206,486 | 654,561 | 244,921 | 265,740 | 1,017,759 |
| Mitchell Hourtienne | — | — | 81,486 | 258,311 | 35,523 | — | 258,311 |
| Dr. Jun Ye | 2,591,695 | 8,215,673 | — | — | — | — | 8,215,673 |
| George Syllantavos | 53,592 | 169,887 | 10,000 | 31,700 | — | — | 201,587 |
| Takayuki Katsuda[4] | — | — | — | — | — | — | — |
| Hideharu (Harry) Konagaya[4] | — | — | — | — | — | — | — |
| Dr. Mei (May) Wang | 17,692 | 56,084 | 10,000 | 31,700 | — | — | 87,784 |
| Xiaogang (Jason) Zhang | 17,692 | 56,084 | 10,000 | 31,700 | — | — | 87,784 |

30. Moreover, certain employment agreements with certain Cepton executives entitle such executives to severance packages, should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant several directors or officers entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

**Golden Parachute Compensation**

| Name | Cash ($)[1] | Equity ($)[2] | Perquisites/ Benefits ($)[3] | Tax Reimbursement ($)[4] | Total ($)[5] |
|---|---|---|---|---|---|
| Dr. Jun Pei | 900,000 | 99,659 | 18,000 | — | 1,017,659 |
| Mitchell Hourtienne | 280,000 | 258,311 | 12,000 | — | 550,311 |
| Dr. Dongyi Liao | 300,000 | 920,301 | 12,000 | — | 1,212,301 |

31. The Proxy Statement fails to adequately all communications regarding post-transaction employment during the negotiation of the underlying transaction. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential

conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

32. Thus, while the Proposed Transaction is not in the best interests of Cepton, Plaintiff, or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete Proxy Statement***

33. The Cepton Board caused to be filed with the SEC a materially misleading and incomplete Proxy Statement that, in violation the Exchange Act, fails to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

34. The Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Proxy Statement fails to disclose:

    a. Why the Company would agree to a deal that did not include a minority-of-the-majority provision considering Koito owned 30.1% of the Company pre-merger, and Defendant Pei and Defendant Ye entered into voting support agreements concurrently with the signing of the merger documents effectively giving Koito 62% of the voting power;

    b. Why the Company's executive officers, including Defendant Pei (together the "Rollover Stockholders"), will be treated differently than all other stockholders of Cepton, including Plaintiff. Specifically, the Rollover Stockholders will be allowed to roll over their equity into the new entity ("Holdco"), allowing the Rollover Stockholders to continue to reap the

benefits of their investments while all other stockholders of the Company, such as Plaintiff, are frozen out of their ownership interests. Notably, the Preliminary Proxy Statement fails to provide information justifying this decision;

    c.    Whether the confidentiality agreements entered into by the Company with Koito differed from any other unnamed confidentiality agreement entered into between the Company and an interested third parties;

    d.    All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including Koito, would fall away; and

    e.    Adequately disclose any and all of the communications regarding post-transaction employment during the negotiation of the underlying transaction which must be disclosed to stockholders.

*Omissions and/or Material Misrepresentations Concerning Cepton Financial Projections*

35. The Proxy Statement fails to provide material information concerning financial projections for Cepton provided by Cepton management to the Company Board and Craig-Hallum and relied upon by Craig-Hallum in its analyses. The Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

36. Notably, the Proxy Statement reveals that as part of its analyses, Craig-Hallum reviewed: "reviewed the Management Projections."

37. The Proxy Statement should have, but fails to provide, certain information in the projections that Cepton management provided to the Company Board and Craig-Hallum. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

38. With regard to the *Management Projections*, the Proxy Statement fails to disclose:
   a. The inputs, metrics, and assumptions used to determine Total Revenue;
   b. The inputs, metrics, and assumptions used to determine Total Cost of Goods Sold;
   c. The inputs, metrics, and assumptions used to determine Gross Profit;
   d. The inputs, metrics, and assumptions used to determine *Margin %*;
   e. The inputs, metrics, and assumptions used to determine Total Operating Expenses; and
   f. The inputs, metrics, and assumptions used to determine Operating Income.

39. The Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

40. This information is necessary to provide Plaintiff, in his capacity as a Company stockholder, with a complete and accurate picture of the sales process and its fairness. Without this information, Plaintiff is not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

41. Without accurate projection data presented in the Proxy Statement, Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of the Craig-Hallum's financial analyses, or make an informed decision whether to vote his shares in favor of the Proposed Transaction. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Craig-Hallum*

42. In the Proxy Statement, Craig-Hallum describes its fairness opinion and the various valuation analyses performed to render such opinion. However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying

assumptions. Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

43. With respect to the *Comparable Public Companies Analysis*, the Proxy Statement fails to disclose:

    a. The inputs, metrics, and assumptions used to determine the Total Enterprise Value ("TEV")/ CY 2024E Revenue utilized for each of the comparable companies;

    b. The inputs, metrics, and assumptions used to determine the TEV/ CY 2025E Revenue utilized for each of the comparable companies;

    c. The specific inputs, metrics, and assumptions used to determine the TEV/ CY 2024E Gross Profit utilized for each of the comparable companies; and

    d. The specific inputs, metrics, and assumptions used to determine the TEV/ CY 2025E Gross Profit utilized for each of the comparable companies.

44. With respect to the *Premiums Paid Analysis*, the Proxy Statement fails to disclose the following:

    a. The specific transactions compared;

    b. The specific premiums paid for each of the transactions considered;

    c. The closing price on the last trading day prior to announcement of the transaction or first reference in the public news media about the transaction (the "*1-Day Price*") transaction utilized;

    d. The closing price 7 calendar days prior to announcement of the transaction or first reference in the public news media about the transaction (the "*1-Week Price*") for each transaction utilized; and

    e. The closing price 30 calendar days prior to announcement of the transaction or first reference in the public news media about the transaction (the "*1-Month Price*") for each transaction utilized.

45. With respect to the *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose:

   a. The inputs, metrics, and assumptions used to determine the terminal revenue multiples of 1.0x to 3.0x utilized;

   b. The inputs, metrics, and assumptions used to determine the discount rate of 20.4% utilized; and

   c. The weighted average cost of capital for the Company utilized.

46. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

47. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes his value and serves his interest as a stockholder. Moreover, without the key financial information and related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in his best interests as a public Cepton stockholder. As such, the Board has violated the Exchange Act by failing to include such information in the Proxy Statement.

## FIRST COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

48. Plaintiff repeats all previous allegations as if set forth in full herein.

49. Defendants have disseminated the Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

50. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities

exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

51. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

52. The Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

53. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

54. The Individual Defendants were at least negligent in filing a Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Proxy Statement not misleading.

55. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to decide whether to vote his shares in

favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

56. Plaintiff repeats all previous allegations as if set forth in full herein.

57. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the Proxy Statement was materially misleading to Plaintiff in his capacity as a Company stockholder.

58. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

59. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Cepton's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being

concealed from Plaintiff and Company, and that the Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

60. The Individual Defendants acted as controlling persons of Cepton within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause Cepton to engage in the wrongful conduct complained of herein. The Individual Defendants controlled Cepton and all of its employees. As alleged above, Cepton is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and against the Defendants, as follows:

A. Enjoining the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to Plaintiff;

C. Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: November 1, 2024              **BRODSKY SMITH**

By: *Evan J. Smith*
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9465 Wilshire Blvd., Ste. 300
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*